**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CRIMINAL NO. **4:23-cr-00335** |
| | § | |
| v. | § | |
| | § | |
| JAVIER ALEJANDRO AGUILAR | § | |
| MORALES | § | |

### INDICTMENT

THE GRAND JURY CHARGES:

### Introduction

At all times relevant to this Indictment, unless otherwise indicated:

**I.      The Defendant and Relevant Entities and Individuals**

    A.      <u>The Defendant and Vitol</u>

1.      The defendant JAVIER ALEJANDRO AGUILAR MORALES ("AGUILAR") was a citizen of Mexico and a resident of Harris County, Texas, in the Southern District of Texas.  AGUILAR was an oil and commodities trader at Vitol Inc.  AGUILAR was a "domestic concern" and an "employee" of a "domestic concern," as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(l).

2.      Vitol Inc. ("Vitol") was a United States company with its principal place of business in Harris County, Texas.  Vitol was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(l)(B).  Vitol was beneficially owned by Vitol Holding BV, a company based in the Netherlands.  These companies, together with their

affiliates, including Switzerland-based Vitol S.A. (collectively, the "Vitol Group"), formed one of the largest oil distributors and energy commodities traders in the world.

3.    Co-Conspirator #1, an individual whose identity is known to the Grand Jury, was a citizen of Switzerland and Spain, and an employee of Vitol S.A.

B.    State-Owned Oil and Gas Companies and Government Officials

4.    Petróleos Mexicanos ("PEMEX") was the state-owned oil company of Mexico. PEMEX and its wholly-owned subsidiaries were wholly-owned and controlled by the government of Mexico and performed functions that Mexico treated as its own. PEMEX and its wholly-owned subsidiaries were "instrumentalities" of a foreign government, and PEMEX's and its wholly-owned subsidiaries' officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(t)(2)(A).

5.    PEMEX Procurement International, Inc. ("PPI") was a wholly-owned and controlled subsidiary of PEMEX headquartered in the United States that handled the acquisition of goods and services on behalf of PEMEX. PPI was an "instrumentality" of a foreign government, and PPI's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(t)(2)(A).

6.    Gonzalo Guzman Manzanilla ("Guzman") was a citizen of Mexico and a resident of Harris County, Texas, in the Southern District of Texas. Guzman worked at PPI in or about and between 1999 and 2020. In or about and between 2016 and 2020, Guzman was a procurement manager at PPI. In addition, at all relevant times, Guzman acted in an official

2

capacity for and on behalf of PEMEX.  Guzman was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(t)(2)(A).

7.      Carlos Espinosa Barba ("Espinosa") was a citizen of Mexico and a resident of Harris County, Texas, in the Southern District of Texas.  Espinosa worked at PPI in or about and between 2006 and 2019.  In or about and between 2017 and 2019, Espinosa was a procurement manager at PPI.  In addition, at all relevant times, Espinosa acted in an official capacity for and on behalf of PEMEX.  Espinosa was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(t)(2)(A).

C.      Intermediaries and Shell Companies

8.      Lionel Hanst ("Hanst") was a citizen of the Netherlands and a resident of Curaçao who owned and maintained several shell companies and bank accounts used to receive, conceal and distribute corrupt payments from and on behalf of Vitol for the benefit of Mexican officials, among others.

9.      Lion-Oil B.V. ("Lion Oil") was a shell company formed in or about November 2014 in Curaçao by Lionel Hanst.  Lion Oil was used to receive, conceal and distribute corrupt payments from and on behalf of Vitol for the benefit of Mexican officials, among others.

10.      Zanza Oil B.V. ("Zanza Oil") was a shell company formed in or about November 2014 in Curaçao by Lionel Hanst.  Zanza Oil was used to receive, conceal and distribute corrupt payments from and on behalf of Vitol for the benefit of Mexican officials, among others.

11.      Intermediary #1, an individual whose identity is known to the Grand Jury, was a citizen of Mexico and a resident of Harris County, Texas, in the Southern District of Texas.

12.     Shell Company #1, Shell Company #2, Shell Company #3, Shell Company #4, and Shell Company #5 (together the "Shell Companies"), entities the identities of which are known to the Grand Jury, were shell or front companies formed in Mexico and used or controlled by Intermediary #1.  The Shell Companies were used to receive, conceal and distribute corrupt payments from and on behalf of Vitol for the benefit of Mexican officials, among others.

## II.     The Foreign Corrupt Practices Act

13.     The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

## III.     The Bribery and Money Laundering Scheme

A.     Overview

14.     In or about and between August 2017 and July 2020, AGUILAR, together with others, engaged in an international bribery and money laundering scheme in which he knowingly, willfully and corruptly offered and paid, and agreed to offer and pay, bribes to and for the benefit of Mexican officials in order to obtain and retain business for Vitol with and related to PEMEX and PPI.

15.     To promote the bribery scheme and to conceal the proceeds derived from the scheme, AGUILAR and his co-conspirators, including Co-Conspirator #1 and Intermediary #1, caused wire transfers of bribes and other corrupt payments to numerous domestic and offshore bank accounts through a network of shell companies and intermediaries.  Many of the wires

4

were sent to bank accounts in the United States or processed through United States-based correspondent banks.

16.     To further promote the bribery scheme and to conceal the proceeds derived from it, AGUILAR and his co-conspirators created and caused the creation of sham consulting agreements and invoices, communicated about the corrupt payments through the use of alias and nonbusiness email accounts and encrypted messaging platforms, and used code names and code words to describe co-conspirators and to refer to corrupt funds used in furtherance of and derived from the scheme.

B.      The Mexico Bribery Scheme

17.     Beginning in or about August 2017, AGUILAR, together with others, engaged in a bribery and money laundering scheme involving the payment of bribes to Mexican officials, including Guzman and Espinosa, in exchange for, among other things, securing improper advantages for Vitol in obtaining and retaining business with PEMEX and PPI.

18.     In or about August 2017, AGUILAR was introduced to Guzman, then a procurement manager at PPI, by a Vitol Group employee and mutual acquaintance.  Shortly thereafter, AGUILAR met with Guzman and Espinosa, also a procurement manager at PPI, in Houston, Texas.  At that meeting, and at subsequent meetings that took place in Houston, Texas in or about and between September 2017 and April 2018, AGUILAR agreed to pay bribes to Guzman and Espinosa for confidential, inside information to assist Vitol in winning business from PPI, including a contract to supply ethane to PEMEX through PPI (the "Ethane Supply Contract").  In particular, AGUILAR agreed to make payments to Guzman and Espinosa totaling approximately $600,000 if Vitol ultimately won the Ethane Supply Contract.

19. In or about June 2018, PPI awarded the Ethane Supply Contract to Vitol.

20. To promote the bribery scheme and to conceal the proceeds derived from it, AGUILAR and his co-conspirators caused the bribes offered and promised to Guzman and Espinosa to be paid through a series of transactions. AGUILAR first caused the wire transfers to be sent from Vitol S.A. bank accounts in the United Kingdom to bank accounts in the names of Lion Oil and Zanza Oil in Curaçao that were controlled by Hanst. Then, at the instruction of AGUILAR, Hanst made payments from Lion Oil and Zanza Oil bank accounts in Curaçao to bank accounts in Mexico in the names of several of the Shell Companies used or controlled by Intermediary #1. Finally, Intermediary #1 caused payments to be made from, to, and through several of the Shell Companies accounts in Mexico, to bank accounts in the United States and Mexico controlled by and for the benefit of Guzman and Espinosa. Some of the payments were also delivered to Guzman in cash by Intermediary #1 in the United States and in Mexico. Guzman also directed Intermediary #1 to make several payments to Guzman's relatives in Mexico in cash or to their bank accounts.

21. To further conceal and disguise the payments, Hanst used Lion Oil and Zanza Oil to enter into a series of sham brokerage and commodity swap agreements with Vitol S.A. (together, the "Sham Vitol Agreements"). At AGUILAR's direction, Hanst signed the Sham Vitol Agreements on behalf of Lion Oil and Zanza Oil even though AGUILAR and Hanst knew that Hanst would not perform any of the swaps or services described in the agreements. Hanst then faxed the agreements to Vitol S.A. at a Swiss fax number provided by AGUILAR.

22. To further conceal and disguise the corrupt and fraudulent transactions with Vitol S.A., Hanst, at AGUILAR's direction, prepared and submitted to Vitol S.A. sham invoices

6

(together, the "Hanst Invoices") on a periodic basis. AGUILAR provided Hanst with the information to include in the Hanst Invoices as purported justification for the payments, even though AGUILAR knew that Hanst, Lion Oil and Zanza Oil did not perform any swaps or provide any services in connection with any such payments.

23.     AGUILAR communicated with Hanst and others using the email address "p#########007@gmail.com," (the "First Aguilar 007 Account") instead of AGUILAR's official Vitol email address. In or about February 2019, AGUILAR began to communicate with Hanst using a new non-Vitol email address, "s##########007@gmail.com" (the "Second Aguilar 007 Account," and together with the First Aguilar 007 Account, the "Aguilar 007 Accounts").

24.     To further facilitate and disguise the payment of bribes, AGUILAR and his co-conspirators also created, executed and caused to be created and executed sham service agreements between one or more of the Shell Companies, used or controlled by Intermediary #1, and both Lion Oil and Zanza Oil, controlled by Hanst, as well as between one or more of the Shell Companies and Guzman.

25.     To further promote the bribery scheme and conceal the proceeds derived from it, AGUILAR and his co-conspirators caused sham invoices to be created from several of the Shell Companies and issued to Lion Oil and Zanza Oil.

26.     Intermediary #1 caused the sham invoices to be sent to AGUILAR who, via the Aguilar 007 Accounts, forwarded them to Hanst, and directed Hanst to make the payments into bank accounts in the names of several of the Shell Companies. At times, AGUILAR copied Co-Conspirator #1, who, like AGUILAR, used an alias and non-business email address. Hanst then

wired money pursuant to the sham invoices into the Shell Company bank accounts AGUILAR had provided to Hanst.

27.     After receiving the funds from Hanst, Intermediary #1 would typically alert Guzman that the money had arrived, referring to the bribes in Spanish as "shoes," "medicine," "invitations," "coffee," "prescriptions" and other code words meant to obscure the nature of the illicit payments.  As agreed by Guzman, Espinosa and Intermediary #1, Intermediary #1 typically retained a percentage of the money Intermediary #1 received from Hanst and wired the rest of the money to bank accounts controlled by or for the benefit of Guzman and Espinosa, respectively, or delivered payments in cash.

28.     In or about and between October 2017 and January 2020, AGUILAR, together with others, caused at least seven bribe payments totaling approximately $371,466 to be paid to or for the benefit of Guzman.

29.     In or about and between October 2017 and September 2019, AGUILAR, together with others, caused at least eight bribe payments totaling approximately $255,895 to be paid to or for the benefit of Espinosa.

## COUNT ONE
### Conspiracy to Violate the FCPA
### (18 U.S.C. § 371)

30.     Paragraphs one through 29 are realleged and incorporated by reference as though fully set forth herein.

31.     In or about and between 2017 and July 10, 2020, both dates being approximate and inclusive, within the Southern District of Texas and elsewhere, AGUILAR, together with others, did knowingly and willfully conspire to commit one or more offenses against the United

8

States, to wit:

      a.     being a domestic concern and an employee of a domestic concern, willfully and corruptly to make use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be and had been offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist AGUILAR, Vitol and others in obtaining and retaining business for and with, and directing business to, Vitol and others, contrary to Title 15, United States Code, Section 78dd-2; and

      b.     while in the territory of the United States, willfully and corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any other act in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing

that all or a portion of such money and thing of value would be and had been offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Intermediary #1 and others in obtaining and retaining business for and with, and directing business to, Vitol and others, contrary to Title 15, United States Code, Section 78dd-3.

## Purpose of the Conspiracy

32.     It was a purpose of the conspiracy for AGUILAR and his co-conspirators to offer, promise to pay and pay bribes to foreign officials, including Guzman and Espinosa, in order to obtain and retain business with PEMEX and PPI, for and with, and direct business to, Vitol.

## Manner and Means of the Conspiracy

33.     The manner and means by which AGUILAR and his co-conspirators sought to accomplish, and did accomplish, the purpose of the conspiracy included, among other ways, the following:

a.     It was part of the conspiracy that AGUILAR arranged and attended meetings, in the Southern District of Texas and elsewhere, with Guzman, Espinosa and others for the purpose of offering to pay bribes totaling over $600,000 in exchange for improper

commercial advantages for Vitol in connection with contracts offered and facilitated by PPI, including the Ethane Supply Contract.

        b.      It was further part of the conspiracy that AGUILAR and his co-conspirators utilized the Sham Vitol Agreements and Hanst Invoices to justify the corrupt transfers from Vitol S.A. to Lion Oil and Zanza Oil, even though AGUILAR and others knew that Hanst did not perform any of the services described in the agreements and invoices.

        c.      It was further part of the conspiracy that, at the instruction of AGUILAR, Hanst made payments, purportedly justified by additional sham service agreements and invoices, to bank accounts in Mexico in the names of several of the Shell Companies used or controlled by Intermediary #1, who then caused payments to be made to bank accounts in the United States and Mexico controlled by and for the benefit of Mexican officials, including Guzman and Espinosa, or delivered in cash, including within the Southern District of Texas.

        d.      It was further part of the conspiracy that AGUILAR and his co-conspirators communicated about the corrupt payments through the use of alias and nonbusiness email accounts, including the Aguilar 007 Accounts, and encrypted messaging platforms and used code names and code words to describe co-conspirators and to refer to corrupt funds used in furtherance of and derived from the schemes.

## Overt Acts

    34.    In furtherance of the conspiracy and to effect its objects, within the Southern District of Texas and elsewhere, AGUILAR, together with others, committed and caused the commission of, among others, the following:

        a.      In or about August 2017, AGUILAR met with Guzman and Espinosa in

Houston, Texas. At the meeting, AGUILAR agreed to pay bribes to Guzman and Espinosa for confidential, inside information that Guzman and Espinosa would provide to assist Vitol in winning business from PPI, including the Ethane Supply Contract.

        b.      On or about September 27, 2017, AGUILAR, via the First Aguilar 007 Account, sent an email to Hanst and to Co-Conspirator #1, via an alias and nonbusiness email account, attaching a sham Shell Company #1 invoice that he had received from a relative of Intermediary #1, and stating it was "for the equivalent of 75k."

        c.      On or about October 6, 2017, Hanst sent an email to AGUILAR at the First Aguilar 007 Account (the "Hanst Oct. 6 Email"), in Spanish, with the subject line, "[Shell Company #1] Contract" and writing, in part, "I need this signed contract back so that the bank will make the transaction. It is requested by the correspondent bank."

        d.      On or about October 6, 2017, in response to the Hanst Oct. 6 Email, AGUILAR, via the First Aguilar 007 Account, sent an email to Hanst attaching an executed sham services agreement between Lion Oil and Shell Company #1.

        e.      On or about October 12, 2017, Intermediary #1 and others caused approximately $32,278 to be wired from a bank account in Mexico in the name of Shell Company #1 to a bank account controlled by Espinosa in the Southern District of Texas.

        f.      On or about December 13, 2017, AGUILAR, via the First Aguilar 007 Account, forwarded an email to Hanst and Co-Conspirator #1, via an alias and nonbusiness email account, attaching a sham invoice and writing, in Spanish and in part, "Can you process it, please?" The attached sham invoice was dated December 6, 2017, issued from Shell Company #1 to Lion Oil and requested approximately €43,977.27 (approximately $51,845).

12

g.      On or about February 23, 2018, Intermediary #1 sent a text message to AGUILAR, via the encrypted messaging platform WhatsApp, asking him, in Spanish, "Will you have the payment receipt they are requesting it from me." AGUILAR responded, "I'll send it next week."

h.      On or about March 16, 2018, Intermediary #1 and others caused approximately $42,695 to be wired from a bank account in Mexico in the name of Shell Company #3 to a United States bank account controlled by and for the benefit of Guzman.

i.      On or about May 11, 2018, AGUILAR communicated with Espinosa, via the encrypted messaging platform WhatsApp, and asked Espinosa for confidential, inside information to assist Vitol in winning business with PPI. Specifically, in sum and substance, AGUILAR requested information concerning Vitol's competitors in connection with a bidding process for business with PPI.

j.      On or about July 4, 2018, AGUILAR, via the First Aguilar 007 Account, sent an email to Hanst and Co-Conspirator #1, via an alias and non-business email account, writing in Spanish, and in part, "We finally have the bbls of ETHANE..... for the long term.... We need to make a movement of 350 Kbls...... divided into 3....." Attached to the email was a spreadsheet containing bank account information and routing instructions for bank accounts in the names of three shell companies: Shell Company #2, Shell Company #4, and Shell Company #5.

k.      On or about July 11, 2018, AGUILAR, via the First Aguilar 007 Account, sent an email to Hanst attaching an invoice from Shell Company #4 to Zanza Oil for approximately €98,187.74 (approximately $114,866), and bank routing information for Shell

13

Company #4 and Shell Company #5.

l.      On or about July 11, 2018, Hanst caused the transfer of approximately €98,187.74 (approximately $114,878) from a Zanza Oil bank account to a bank account in Mexico in the name of Shell Company #4.

m.      On or about July 11, 2018, Intermediary #1 sent a text message to Guzman, via the encrypted messaging platform WhatsApp, stating, in Spanish and in relevant part, "A prescription has already been sent according to him it will be supplied within the next few days."

n.      On or about July 16, 2018, Intermediary #1 sent a text message to Guzman, via the encrypted messaging platform WhatsApp, stating, in Spanish and in relevant part, "The first prescription is ready.  It will be available after 4pm today."

o.      On or about July 19, 2018, Intermediary #1 and others caused approximately MEX$741,000 Mexican Pesos (approximately $38,787) to be transferred from a bank account in Mexico in the name of Shell Company #4 to a bank account in Mexico in the name of Shell Company #2.

p.      On or about July 19, 2018, Intermediary #1 and others caused approximately $37,000 to be wired from a bank account in Mexico in the name of Shell Company #2 to a bank account controlled by Espinosa in the Southern District of Texas.

q.      On or about August 6, 2018, AGUILAR, via the First Aguilar 007 Account, sent an email to Hanst attaching various documents, including executed sham services agreements between Lion Oil and Shell Company #2, and between Lion Oil and Shell Company #5,

14

r.      On or about October 12, 2018, AGUILAR, via the First Aguilar 007 Account, sent an email to Hanst attaching sham invoices from Shell Company #4 to Lion Oil and to Zanza Oil, each for approximately €105,688.23 (approximately $122,229).

s.      On or about October 19, 2018, Hanst transferred approximately €105,688.23 from a Lion Oil bank account to a bank account in Mexico in the name of Shell Company #4.

t.      On or about October 19, 2018, Hanst transferred approximately €105,688.23 from a Zanza Oil bank account to a bank account in Mexico in the name of Shell Company #4.

u.      On or about October 30, 2018, Intermediary #1 and others caused a transfer in the amount of approximately MEX$900,000 Mexican Pesos (approximately $44,905) from a bank account in Mexico in the name of Shell Company #4 to a bank account in Mexico in the name of Shell Company #2.

v.      On or about October 31, 2018, Intermediary #1 and others caused a transfer in the amount of approximately MEX$642,333 Mexican Pesos (approximately $31,508) from a bank account in Mexico in the name of Shell Company #4 to a bank account in Mexico in the name of Shell Company #2.

w.      On or about October 31, 2018, Intermediary #1 and others caused a transfer in the amount of approximately MEX$875,647 Mexican Pesos (approximately $42,953) from a bank account in Mexico in the name of Shell Company #4 to a bank account in Mexico in the name of Shell Company #2.

x.      On or about October 31, 2018, Intermediary #1 and others caused

15

approximately $36,000 to be wired from a bank account in Mexico in the name of Shell Company #2 to a bank account in the United States controlled by, and for the benefit of, Guzman.

y.      On or about October 31, 2018, Intermediary #1 and others caused approximately $40,000 to be wired from a bank account in Mexico in the name of Shell Company #2 to a bank account in the United States controlled by, and for the benefit of, Espinosa.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### Violation of the FCPA
### (15 U.S.C. § 78dd-2; 18 U.S.C. § 2)

35.      Paragraphs one through 29 are realleged and incorporated by reference as though fully set forth herein.

36.      On or about August 6, 2018, within the Southern District of Texas and elsewhere, AGUILAR, together with others, being a domestic concern and an employee of a domestic concern, did willfully and corruptly make use of, and aid, abet, counsel, command, induce, procure, and willfully cause others to make use of, the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be and had been offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and

16

official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign

political party and official thereof to do and omit to do acts in violation of the lawful duty of

such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign

official, foreign political party and official thereof to use his, her or its influence with a foreign

government and agencies and instrumentalities thereof to affect and influence acts and decisions

of such government and agencies and instrumentalities, in order to assist AGUILAR, Vitol and

others in obtaining and retaining business for and with, and directing business to, Vitol and

others, as follows: AGUILAR, via the First Aguilar 007 Account, sent an email to Hanst

attaching various documents including a sham executed services agreement between Lion Oil

and Shell Company #2, and between Lion Oil and Shell Company #5.

All in violation of Title 15, United States Code, Section 78dd-2 and Title 18, United

States Code, Section 2.

## COUNT THREE
### Travel Act – Texas Commercial Bribery
### (18 U.S.C. §§ 1952(a)(1)(A), 1952(a)(3)(A) and 2)

37.     Paragraphs one through 29 are realleged and incorporated by reference as though

fully set forth herein.

38.     On or about and between October 12, 2018 and October 31, 2018, both dates

being approximate and inclusive, within the Southern District of Texas and elsewhere,

AGUILAR, together with others, did travel in and use the mail and one or more facilities in

interstate and foreign commerce with the intent to: (a) distribute the proceeds of an unlawful

activity, to wit: commercial bribery, in violation of the laws of the State of Texas, Penal Code

Section 32.43; and (b) otherwise promote, manage, establish, carry on and facilitate the

17

promotion, management, establishment, and carrying on of such unlawful activity, and thereafter

knowingly and willfully performed and attempted to perform, the distribution of the proceeds of

such unlawful activity, and the promotion, management, establishment, carrying on and

facilitation of the promotion, management and carrying on of such unlawful activity, and did aid,

abet, counsel, command, induce, procure, and willfully cause others to do the same, as follows:

AGUILAR, via the First Aguilar 007 Account, sent an email to Hanst attaching sham invoices

from Shell Company #4 to Lion Oil and to Zanza Oil, each for approximately €105,688.23

(approximately $121,518).

All in violation of Title 18, United States Code, Sections 1952(a)(1)(A), 1952(a)(3)(A)

and 2.

## COUNTS FOUR AND FIVE
**Money Laundering**
**(18 U.S.C. §§ 1956(a)(2)(B)(i) and 2)**

39.     Paragraphs one through 29 are realleged and incorporated by reference as though

fully set forth herein.

40.     On or about the dates set forth below, within the Southern District of Texas and

elsewhere, AGUILAR did knowingly and intentionally commit offenses, and aid, abet, counsel,

command, induce, procure, and willfully cause others to commit offenses, under Title 18, United

States Code, Section 1956, to wit: transporting, transmitting and transferring, and attempting to

transport, transmit and transfer, monetary instruments and funds from one or more places in the

United States to and through one or more places outside the United States and to one or more

places in the United States from and through one or more places outside the United States,

knowing that such monetary instruments and funds involved in the transportation, transmissions

and transfers represented the proceeds of some form of unlawful activity, and knowing that such

transportation, transmissions and transfers were designed in whole and in part to conceal and

disguise the nature, the location, the source, the ownership and the control of the proceeds of one

or more specified unlawful activities, to wit: (i) felony violations of the FCPA, in violation of

Title 15, United States Code, Sections 78dd-2 and 78dd-3; (ii) one or more offenses against a

foreign nation involving bribery of a public official, and the misappropriation, theft and

embezzlement of public funds by and for the benefit of a public official, in violation of the

Mexican Penal Code, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv); and

(iii) one or more acts or activities constituting an offense under the Travel Act, Title 18, United

States Code, Section 1952(a)(1)(A) and 1952(a)(3)(A), as set forth below:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| FOUR | October 31, 2018 | Wire of approximately $36,000 transmitted from a bank account in Mexico in the name of Shell Company #2 to a bank account for the benefit of Guzman in the Southern District of Texas. |
| FIVE | October 31, 2018 | Wire of approximately $40,000 transmitted from a bank account in Mexico in the name of Shell Company #2 to a bank account for the benefit of Espinosa in the Southern District of Texas. |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.

## NOTICE OF CRIMINAL FORFEITURE
## AS TO COUNTS ONE THROUGH THREE

41.     The United States hereby gives notice to the defendant that, upon his conviction

of any of the offenses charged in Counts One, Two and Three, the government will seek

19

forfeiture, in accordance with Title 18, United States Code, Section 981(a)(l)(C) and Title 28, United States Code, Section 2461(c), of any property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

**NOTICE OF CRIMINAL FORFEITURE
AS TO COUNTS FOUR AND FIVE**

42.     The United States hereby gives notice to the defendant that, upon his conviction of any of the offenses charged in Counts Four and Five, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 982(a)(1), of any property, real or personal, involved in such offenses, or any property traceable to such property.

**MONEY JUDGMENT AND SUBSTITUTE ASSETS**

43.     The United States will seek the imposition of a money judgment against the defendant.  In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States may seek to forfeit any other property of the defendant in substitution.

A TRUE BILL

**Original Signature on File**

FOREPERSON OF THE GRAND JURY

ALAMDAR S. HAMDANI
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF
TEXAS

GLENN S. LEON
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPT. OF JUSTICE

20

BY: _Sherin Daniel_
     SHERIN DANIEL
     SUZANNE ELMILADY
     ASSISTANT U.S. ATTORNEYS

     MARGARET MOESER
     ACTING CHIEF
     MONEY LAUNDERING AND
     ASSET RECOVERY SECTION
     CRIMINAL DIVISION
     U.S. DEPT. OF JUSTICE

BY: _____
     D. HUNTER SMITH
     TRIAL ATTORNEY

BY: _____
     CLAYTON P. SOLOMON
     TRIAL ATTORNEY